WO

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Erin K Murphy, | No. CV-12-02244-PHX-BSB |
| Plaintiff, | **ORDER** |
| v. | |
| Carolyn W. Colvin, Acting Commissioner of Social Security, | |
| Defendant. | |

Plaintiff Erin K. Murphy seeks judicial review of the final decision of the Commissioner of Social Security (the Commissioner) denying her applications for disability insurance benefits and supplemental security income benefits under the Social Security Act (the Act). The parties have consented to proceed before a United States Magistrate Judge pursuant to 28 U.S.C. § 636(b) and have filed briefs in accordance with Local Rule of Civil Procedure 16.1. For the following reasons, the Court affirms the Commissioner's decision.

## I.    Procedural History

In July 2009, Plaintiff applied for disability insurance benefits, 42 U.S.C. § 401-34, and supplemental security income, 42 U.S.C. § 1381-83c, under Titles II and XVI of the Act. (Tr. 209-23.)[1] Plaintiff alleged that she became disabled on October 31, 2005 due to posttraumatic stress disorder (PTSD), fibromyalgia, and chronic fatigue. (Tr. 260-

---

[1]   Citations to "Tr." are to the certified administrative transcript of record located at docket 20.

1   61.)  After the Commissioner denied Plaintiff's claims at the initial and reconsideration

2   levels, she requested a hearing before an Administrative Law Judge (ALJ).  (Tr. 108-09,

3   144-47, 110-43, 162-64.)  The ALJ conducted a hearing and issued a decision on October

4   7, 2011 denying Plaintiff's claims.  (Tr. 25-47.)

5        The ALJ's decision became the final decision of the Commissioner when the

6   Social Security Administration Appeals Council denied Plaintiff's request for review.

7   (Tr. 5-11.); *see* 20 C.F.R. § 404.981 (explaining the effect of a disposition by the Appeals

8   Council).  Plaintiff exhausted the administrative review process and timely appealed the

9   Commissioner's final determination pursuant to 42 U.S.C. § 405(g) by filing a Complaint

10  with this Court.

11  **II.    Medical Record**

12       The record includes the following evidence regarding Plaintiff's physical and

13  mental impairments.

14       **A.    Physical Impairments**

15            **1.    Michael J. Fairfax, D.O.**

16       Michael J. Fairfax, D.O., a rheumatologist, treated Plaintiff between September

17  20, 2006 and November 27, 2006.  (Tr. 337-55.)  During his initial assessment of

18  Plaintiff, Dr. Fairfax obtained a history of Plaintiff's musculoskeletal pain and conducted

19  a physical examination.  (Tr. 345-46.)  Dr. Fairfax diagnosed fibromyalgia.  (Tr. 346.)

20  He found tender points "over multiple major muscle bursal and tendon groups."

21  (Tr. 347.)  On November 27, 2006, Dr. Fairfax again assessed fibromyalgia.  (Tr. 349.)

22            **2.    Joe K. Gregory, D.O.**

23       In July 19, 2007, Plaintiff began treating with Joe Gregory, D.O.  (Tr. 440-42.) Dr.

24  Gregory diagnosed chronic fibromyalgia and chronic fatigue syndrome.  (Tr. 442.)  On

25  August 30, 2007, Dr. Gregory noted that Plaintiff's fibromyalgia had gotten worse.  (Tr.

26  439.)  On October 16, 2007, Dr. Gregory treated Plaintiff for "moderately severe"

27  headaches that were aggravated by sitting, walking, and standing.  (Tr. 436.)  He assessed

28  Plaintiff with chronic fibromyalgia and tension headaches.  (Tr. 437.)  On November 12,

1   2007, Dr. Gregory described the intensity of Plaintiff's headaches and muscle pain as
2   "moderate-severe."  (Tr. 434.)  On December 18, 2007, Dr. Gregory saw Plaintiff for a
3   follow-up regarding her muscle pain related to fibromyalgia.  He noted that Lyrica
4   relieved some of Plaintiff's pain.  (Tr. 432.)  Dr. Gregory reported that Plaintiff was also
5   taking Oxycodone, MS Contin, Baclofen, Phenergan, Doxepin, Cymbalta, and Voltaren.
6   (*Id.*)

7                   **3.      Karen Acevedo-Mogharbel, D.O.**

8           Karen Acevedo-Mogharbel, D.O., a primary care physician, treated Plaintiff for
9   fibromyalgia, asthma, chronic pain, kidney disease, chronic fatigue, hypothyroidism,
10  cervicalgia, and a history of deep vein thrombosis from November 20, 2008 through
11  2011.  (Tr. 513-25, 695-701, 1121-57.)  In August 2010, she completed a "residual
12  functional capacity form" indicating that Plaintiff could: (1) frequently lift and carry up
13  to five pounds, and occasionally lift and carry up to twenty pounds; (2) sit for two hours
14  total in an eight-hour workday; (3) stand for two hours total in an eight-hour workday;
15  (4) walk for three hours total in an eight-hour workday; (5) occasionally climb
16  stairs; (6) never bend, stoop, crouch, kneel, or crawl; and (7) never use her hands for
17  grasping, pushing/pulling, or fine manipulations.  (Tr. 808-09.)  She found that Plaintiff
18  could not be exposed to unprotected heights, moving machinery, and temperature
19  extremes.  (Tr. 809.)  She also found that Plaintiff had "severe" pain, fatigue, inability to
20  deal with stress, and cognitive problems.  (Tr. 809.)

21          In October 2010, Dr. Acevedo-Mogharbel found that Plaintiff's severe pain and
22  fatigue limited her to sitting, standing, and walking for no more than two to three hours in
23  an eight-hour workday.  (Tr. 1121.)  Dr. Acevedo-Mogharbel sent a letter, dated
24  September 2, 2011, to Plaintiff's attorney, Scott Davis, and opined that Plaintiff was
25  unable "to sustain any kind of gainful employment presently or in the future."  (Tr. 1117.)

26                   **4.      Mesa Pain Management Center**

27          On referral from Dr. Acevedo-Mogharbel, between January 8, 2009 and July 7,
28  2010, Plaintiff received treatment at the Mesa Pain Management Center (MPMC) for

chronic fibromyalgia pain.  (Tr. 541-634; 702-709.)  As the ALJ noted, the records from MPMC indicate that Plaintiff received pain management, including epidural injections, to treat her pain.  (Tr. 35.)  The treatment notes indicate that Plaintiff had a decreased range of motion in her lumbar spine.  (Tr. 543, 550, 557, 571, 578. 585, 705.)  The majority of the MPMC treatment records indicate that Plaintiff had "adequate" pain control, could function "adequately" or "well," and could perform all activities of daily living (ADL) and function independently.[2]  (Tr. 544, 551, 562, 572, 579.)  Plaintiff also reported that yoga, muscles relaxers, and pain medication reduced her pain.  (Tr. 553, 574.)

On March 4, 2009, MPMC records indicate that Plaintiff's pain control was "barely adequate" and she was functioning "barely adequately."  (Tr. 600.)  However, she was able to perform ADLs and function independently.  (*Id*.)  On August 9, 2009, Plaintiff reported that her pain control was adequate, and that she was functioning "barely adequately" on her current regimen.  (Tr. 558.)  Plaintiff, however, could perform ADLs and function independently on that date.  (*Id*.)

### 5.   Daniel Ryklin, M.D.

On referral from Dr. Acevedo-Mogharbel, Plaintiff also received treatment from Dr. Ryklin at the Arizona Pain and Spine Institute from July 2010 through 2011.  (Tr. 795-96.)  In July 2010, Dr. Ryklin found eleven out of eighteen fibromyalgia tender points.  (Tr. 798.)  He noted that Plaintiff could heel walk, toe walk, perform a full squat, and climb onto the examination table without difficulty.  (*Id*.)  In an August 2011 treatment note, nurse practitioner Linda Milam found myofascial trigger points.  (Tr. 986.)

On September 8, 2011, Dr. Ryklin and Nurse Milam jointly completed a "residual functional capacity form" indicating that Plaintiff could: (1) occasionally lift and carry up to five pounds; (2) sit for two hours total in an eight-hour workday; (3) stand for one hour total in an eight hour workday; (4) walk for twenty minutes total in an eight-hour

---

[2]  Plaintiff's "pain control" was assessed on a scale of "good" "adequate" "barely adequate" or "poor."  (Tr. 544.)  Her ability to function was assessed on a scale of "well" "adequately" "barely adequately" or "poorly."  (*Id*.)

workday; (5) very seldom climb stairs; (6) occasionally bend; and (7) never to very seldom stoop, crouch, kneel, or crawl.  (Tr. 1118.)  They found that Plaintiff should avoid exposure to unprotected heights, moving machinery, and temperature extremes.  (Tr. 1119.)  They also noted that Plaintiff had "severe" pain, fatigue, and inability to deal with stress.  (*Id.*)  In the "remarks" section of the form, Dr. Ryklin and Nurse Milam noted that Plaintiff had recently been discharged from the hospital in August 2011 after "extensive blood clot treatment, which had further limited her functional activity tolerance."  (Tr. 1120.)

On September 15, 2011, Nurse Milam wrote a letter to Plaintiff's attorney confirming the presence of generalized trigger points and opining that Plaintiff "could not tolerate activity to sustain full time work of any kind."  (Tr. 1160.)

### 6.    Manuel Abrante, M.D.

In late December 2010 and continuing to 2011, Manuel Abrante, M.D., treated Plaintiff for chronic kidney disease, stage III with related deep vein thrombosis and history of hospitalization for acute renal failure.  (Tr. 1100-16.)  In December 2010, Dr. Abrante noted Plaintiff's diagnoses of chronic fatigue syndrome and fibromyalgia.  (Tr. 1100.)  He noted that Plaintiff was "doing pretty well."  (Tr. 1104.)  In August 2011, Dr. Abrante noted that Plaintiff felt tired but was otherwise "well."  (Tr. 1101-1102.)

### 7.    Stephen Dickstein, M.D.

In February 2010, Stephen Dickstein, M.D., a State agency physician, reviewed the medical record and completed a physical residual functional capacity assessment.  (Tr. 742-49.)  Dr. Dickstein concluded that Plaintiff could: (1) occasionally lift and/or carry twenty pounds; (2) frequently lift and/or carry ten pounds; (3) sit for about six hours in an eight-hour workday, (4) stand and/or walk for about six hours in an eight-hour workday (Tr. 743); (5) Plaintiff could frequently climb ramps and stairs, balance, and stoop; and (6) occasionally climb ladders, ropes, or scaffolds, kneel, crouch, and crawl.  (Tr. 744.)  Dr. Dickstein found that Plaintiff had no manipulative, visual, or communicative limitations.  (Tr. 745-46.)  He further found that Plaintiff should avoid

concentrated exposure to temperature extremes and environmental pollutants, and should be exposed to heights only occasionally.  (Tr. 746.)

### B.    Mental Impairments

#### 1.    Jonna Krabbenhoft, Psy.D.

In January 2010, licensed psychologist Jonna Krabbenhoft, Psy.D., evaluated Plaintiff.   (Tr. 710-18.)   Dr. Krabbenhoft diagnosed Plaintiff with depression not otherwise specified (NOS), and post-traumatic stress disorder.  (Tr. 717).

Dr. Krabbenhoft completed a "psychological/psychiatric medical source statement," indicating that Plaintiff had: (1) no impairment in the ability to remember locations and work-like procedures or understand and remember very short and simple instructions; (2) mild impairment in the ability to understand and remember detailed instructions; (3) no impairment in the ability to carry out very short and simple instructions; (4) mild to moderate impairment in the ability to carry out detailed instructions; (5) mild impairment in the ability to maintain attention and concentration for extended periods, and in the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; (6) no impairment in the ability to sustain an ordinary routine without special supervision, the ability to work in coordination with or proximity to others without being distracted by them, or the ability to make simple work-related decisions; (7) mild to moderate impairment in the ability to complete a normal workday and work week without interruptions from psychologically-based symptoms, and to perform at a consistent pace without an unreasonable number and length of rest periods; (8) no impairment in the ability to interact appropriately with the general public, or the ability to ask simple questions or request assistance; (9) moderate impairment in the ability to accept instructions and respond appropriately to criticism from supervisors, and the ability to get along with co-workers or peers without distracting them or exhibiting behavioral extremes; and (10) no impairment in the ability to maintain socially appropriate behavior, and to adhere to basic standards of neatness and cleanliness.  (Tr. 719.)

### 2. Randall Garland, Ph.D.

In February 2010, State agency psychologist Randall Garland, Ph.D., reviewed the medical record and completed a Psychiatric Review Technique form.  (Tr. 728-41.) Dr. Garland found that Plaintiff had: (1) "mild" restriction of activities of daily living; (2) "moderate" difficulties in maintaining social functioning; ( 3 ) "moderate" difficulties in maintaining concentration, persistence or pace; and (4) no episodes of decompensation.  (Tr. 738.)

Dr. Garland also completed an assessment of Plaintiff's mental functional capacity and concluded that she was able to meet the basic demands of competitive, remunerative, unskilled work on a sustained basis, including the ability to: "(1) understand, carry out, and remember simple instructions; (2) make judgments commensurate with the functions of unskilled work, i.e., simple work-related decisions; (3) respond appropriately to supervision, co-workers, and work situations; and (4) deal with changes in a routine work setting."  (Tr. 723-25.)

### 3. Phoenix Interfaith Counseling

Plaintiff obtained treatment from Phoenix Interfaith Counseling (PIC) from 2009 through 2011.  (Tr. 635-94, Tr. 756-71, Tr. 936-82.)  The PIC treatment notes include diagnoses of mood disorder and post-traumatic stress disorder.  (Tr. 650, 662, 668, 941, 982.)  The PIC records mainly consist of therapy notes.  However, psychiatric progress notes indicate that Plaintiff's global assessment of functioning (GAF) scores ranged from 52, indicating "moderate symptoms," to 70, indicating "mild symptoms."  (Tr. 651, 665, 757, 766-67, 946, 955, 963, 974, 979.)

On October 19, 2010, Plaintiff reported that she was trying to work and socialize.  (Tr. 969.)  On March 9, 2011, Plaintiff reported that her sleep and appetite were good, her anxiety was low, and she was trying to start an online retail business.  (Tr. 946.)  On March 25, 2011, Plaintiff reported that she was busy getting her business together, scheduling appointments, and completing projects.  (Tr. 944.)  She indicated that she had more energy and felt less pain.  (*Id*.)

**III.    Administrative Hearing Testimony**

Plaintiff was in her mid-thirties at the time of the September 2011 administrative hearing.  (Tr. 39.)  She had a high school education.  (*Id*.)  Her last relevant work included sales representative, vocational training instructor, and "tavern manager." (Tr. 39.)  Plaintiff testified that she could not work due to fibromyalgia pain, kidney pain, chronic fatigue, depression, lower disc problems, concentration and memory difficulties, dizziness, nausea, and vomiting.  (Tr. 55.)  Plaintiff also testified that she had chronic fatigue, an eight on a scale of one to ten, and that she fell asleep unexpectedly several times a week.  (Tr. 59-60, 83, 85.)  She stated that she usually napped once in morning and once in the afternoon.  (*Id*. at 60.)  Plaintiff also testified that she spent ninety percent of every week in her bedroom.  (Tr. 90.)

Plaintiff testified that her medications made her dizzy and required her to sit with her head between her knees for approximately thirty minutes.  (*Id.* at 63.)  She stated that she experienced nausea daily and vomited three times a week.  (*Id*.)  Plaintiff also testified that, although she had been in counseling for two years, it had not helped.  (*Id*. at 61.)  Plaintiff testified that she could sit for ten to fifteen minutes at a time and for two hours total during the day, and stand and walk for five minutes each at a time and for one hour total in an eight hour day.  (Tr. 88-89.)  Plaintiff testified that she could not lift or carry a gallon of milk.  (Tr. 89.)

Vocational expert (VE) Kathryn A. Atha also testified at the hearing.  (Tr. 28.) The ALJ asked the VE to consider a hypothetical individual who was Plaintiff's age, with the same education, and work experience.  The hypothetical individual had the following limitations: (1) occasionally lift or carry up to twenty pounds; (2) frequently lift or carry ten pounds; (3) frequently climb ramps and stairs, balance, or stoop; (4) occasionally climb ladders, ropes, and scaffolds, kneel, crouch, or crawl; (5) avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation; (6) avoid even moderate exposure to hazards, such as moving machinery and unprotected heights; and (7) limited to unskilled, rote, routine work.  (Tr. 97.)

1    The ALJ asked whether there were occupations that the hypothetical person could
2    perform.  (Tr. 97.)  The VE responded that the individual could perform unskilled, light
3    jobs, including garment sorter (Dictionary of Occupational Titles (DOT) 222.687-014)
4    (2,138 jobs in Arizona and 217,783 jobs in the United States); cafeteria attendant (DOT
5    311.677-010) (2,224 jobs in Arizona and 73,703 jobs in the United States); and restaurant
6    cashier (DOT 311.472-010) (22,974 jobs in Arizona and 1,126,369 jobs in the United
7    States).  (Tr. 98.)

8    **IV.    The ALJ's Decision**

9        A claimant is considered disabled under the Act if he is unable "to engage in any
10   substantial gainful activity by reason of any medically determinable physical or mental
11   impairment which can be expected to result in death or which has lasted or can be
12   expected to last for a continuous period of not less than 12 months."   42 U.S.C.
13   § 423(d)(1)(A); *see also* 42 U.S.C. § 1382c(a)(3)(A) (stating nearly identical standard for
14   supplemental security income disability insurance benefits).   To determine whether a
15   claimant is disabled, the ALJ uses a five-step sequential evaluation process.  *See* 20
16   C.F.R. §  404.1520, 416.920.

17       In the first two steps, a claimant seeking disability benefits must initially
18   demonstrate (1) that he is not presently engaged in a substantial gainful activity, and (2)
19   that his disability is severe. 20 C.F.R. § 404.1520(a) (c).  If a claimant meets steps one
20   and two, he may be found disabled in two ways at steps three or four.  At step three, he
21   may prove that his impairment or combination of impairments meets or equals an
22   impairment in the Listing of Impairments found in Appendix 1 to Subpart P of 20 C.F.R.
23   pt. 404. 20 C.F.R. § 404.1520(a)(4)(iii).  If so, the claimant is presumptively disabled.  If
24   not, the ALJ proceeds to step four.  At step four, the ALJ determines a claimant's residual
25   functional capacity.  A claimant's RFC is what he can still do despite existing physical,
26   mental, nonexertional, and other limitations.  *Cooper v. Sullivan*, 880 F.2d 1152, 1155
27   n.5 (9th Cir. 1989).  A claimant must prove that his RFC precludes him from performing
28   his past work. 20 C.F.R. § 404.1520(a)(4)(iv).  Once the claimant has established this

*prima facie* case, the burden shifts to the government at step five to establish that the claimant can perform other jobs that exist in significant number in the national economy, considering the claimant's RFC, age, work experience, and education.  If the government does not meet this burden, then the claimant is considered disabled within the meaning of the Act.  *Bray v. Comm'r. of Soc. Sec. Admin*, 554 F.3d 1219, 1222-23 (9th Cir. 2009).

Applying the five-step sequential evaluation process, the ALJ first found that Plaintiff had not performed substantial gainful activity since the October 31, 2005 alleged onset date.  (Tr. 30.)  At step two, the ALJ found that Plaintiff had the following severe impairments: "fibromyalgia, chronic kidney disease, lumbar degenerative disease, hypertension, asthma, obesity, mood disorder, and posttraumatic stress disorder."  (*Id.*)  At the third step, the ALJ found that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1. (Tr. 31.)

At step four, the ALJ found that Plaintiff had the RFC to perform light work as defined in 20 CFR § 404.1567(b) and § 416.967(b).  (*Id.* at 34.)  The ALJ explained that Plaintiff could "frequently balance, stoop, and climb ramps and stairs, and occasionally kneel, crouch, crawl, and climb ladders, ropes, and scaffolds."  (*Id.* at 34-35.)  The ALJ further found that Plaintiff should "avoid concentrated exposure to extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation, and even moderate exposure to hazards, such as moving machinery and unprotected heights."  (*Id.* at 35.)  The ALJ also found that Plaintiff was limited to "unskilled, rote, routine work."  (*Id.*)

At step five, the ALJ found that Plaintiff was unable to perform her past relevant work (Tr. 40), but that she could perform other jobs existing in significant numbers in the national economy.  (*Id.*)  Thus, the ALJ found that Plaintiff was not disabled within the meaning of the Act.  (*Id.*)

## V.    Standard of Review

The district court has the "power to enter, upon the pleadings and transcript of record, a judgment affirming, modifying, or reversing the decision of the Commissioner

1    of Social Security, with or without remanding the cause for a rehearing."   42 U.S.C.

2    § 405(g).   The district court reviews the Commissioner's final decision under the

3    substantial evidence standard.   Under this standard the court must affirm the

4    Commissioner's decision if it is supported by substantial evidence and it is free from

5    legal error.  *Smolen v. Chater*, 80 F.3d 1273, 1279 (9th Cir. 1996); *Ryan v. Comm'r of*

6    *Soc. Sec. Admin.*, 528 F.3d 1194, 1198 (9th Cir. 2008).

7          Even if the ALJ erred, however, "[a] decision of the ALJ will not be reversed for

8    errors that are harmless."   *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

9    Substantial evidence means more than a mere scintilla, but less than a preponderance; it

10   is "such relevant evidence as a reasonable mind might accept as adequate to support a

11   conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citations omitted); *see*

12   *also Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2005).   To determine whether

13   substantial evidence supports a decision, the court considers the record as a whole and

14   "may not affirm simply by isolating a specific quantum of supporting evidence." *Orn v.*

15   *Astrue*, 495 F.3d 625, 630 (9th Cir. 2007) (internal quotation and citation omitted).

16         The court also may not "affirm the ALJ's . . . decision based on evidence that the

17   ALJ did not discuss."  *Connett v. Barnhart*, 340 F.3d 871, 874 (9th Cir. 2003); *see also*

18   *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947) (a reviewing court "must judge the

19   propriety of [administrative] action solely by the grounds invoked by the agency" and

20   stating that if "those grounds are inadequate or improper, the court is powerless to affirm

21   the administrative action by substituting what it considers to be a more adequate or

22   proper basis").

23         The ALJ is responsible for resolving conflicts in testimony, determining

24   credibility, and resolving ambiguities.  *See Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th

25   Cir. 1995). "When the evidence before the ALJ is subject to more than one rational

26   interpretation, [the court] must defer to the ALJ's conclusion." *Batson v. Comm'r of Soc.*

27   *Sec. Admin.*, 359 F.3d 1190, 1198 (9th Cir. 2004) (citing *Andrews*, 53 F.3d at 1041)

28

1    **VI.    Discussion**

2        Plaintiff contends that the ALJ erred by rejecting the opinions of Dr. Acevedo-

3    Mogharbel and Dr. Ryklin without providing specific and legitimate reasons and by

4    failing to give clear and convincing reasons for finding Plaintiff's testimony not credible.

5    (Doc. 23 at 2.)   The Commissioner asserts that the ALJ's decision is supported by

6    substantial evidence and is free from legal error.  (Doc. 26.)

7        **A.    Weight Assigned Medical Source Opinions**

8        In weighing medical source evidence, the Ninth Circuit distinguishes between

9    three types of physicians: (1) treating physicians, who treat the claimant; (2) examining

10   physicians, who examine but do not treat the claimant; and (3) non-examining physicians,

11   who neither treat nor examine the claimant.  *Lester v. Chater*, 81 F.3d 821, 830 (9th Cir.

12   1995).  Generally, more weight is given to a treating physician's opinion.  *Id.*  The ALJ

13   must provide clear and convincing reasons supported by substantial evidence for

14   rejecting a treating or an examining physician's uncontradicted opinion.  *Id*; *Reddick v.*

15   *Chater*, 157 F.3d 715, 725 (9th Cir. 1998).  An ALJ may reject the controverted opinion

16   of a treating or an examining physician by providing specific and legitimate reasons that

17   are supported by substantial evidence in the record.  *Bayliss v. Barnhart*, 427 F.3d 1211,

18   1216 (9th Cir. 2005); *Reddick*, 157 F.3d at 725.

19       Opinions from non-examining medical sources are entitled to less weight than

20   treating or examining physicians.  *Lester*, 81 F.3d at 831.  Although an ALJ generally

21   gives more weight to an examining physician's opinion than to a non-examining

22   physician's opinion, a non-examining physician's opinion may nonetheless constitute

23   substantial evidence if it is consistent with other independent evidence in the record.

24   *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002).  When evaluating medical

25   opinion evidence, the ALJ may consider "the amount of relevant evidence that supports

26   the opinion and the quality of the explanation provided; the consistency of the medical

27   opinion with the record as a whole; [and] the specialty of the physician providing the

28   opinion . . . ."  *Orn*, 495 F.3d at 631.

- 12 -

1

**B.      Weight Assigned Medical Opinions in this Case**

2       Contrary to Plaintiff's assertion, the ALJ did not err in weighing the medical

3  opinions presented in this case.  Based on the record evidence, the ALJ found that

4  Plaintiff had the residual functional capacity to frequently climb ramps and stairs,

5  balance, or stoop, occasionally climb ladders, ropes, and scaffolds, kneel, crouch, or

6  crawl.  (Tr. 34-35.)  She also found that Plaintiff should "avoid concentrated exposure to

7  extreme cold, extreme heat, fumes, odors, dusts, gases, and poor ventilation," and that she

8  should avoid "even moderate exposure to hazards, such as moving machinery and

9  unprotected heights."  (Tr. 34.)

10      In making this assessment, the ALJ gave little weight to the Dr. Acevedo-

11  Mogharbel's and Dr. Ryklin's functional capacity assessments.  (Tr. 33-36.)  The ALJ

12  concluded that those opinions were unsupported by the doctors' treatment notes and by

13  the medical record.  (*Id*.)  As discussed below, these are specific and legitimate reasons

14  for giving little weight to Dr. Acevedo-Mogharbel's and Dr. Ryklin's functional capacity

15  assessments, which were inconsistent with the functional capacity assessment completed

16  by non-examining agency physician Dickstein and with other record evidence.  (Tr. 742-

17  47; Tr. 38 (citing exhibit 16F).)[3]

18      **1.      Dr. Acevedo-Mogharbel**

19      Dr. Acevedo-Mogharbel completed two medical source statements opining that, as

20  result of Plaintiff's severe pain and fatigue, Plaintiff was capable of less than a full range

21  of sedentary work.  (Tr. 808-10, Aug. 16, 2010 RFC form; Tr. 1121, Oct. 8, 2010 form.)[4]

22  On September 2, 2011, Dr. Acevedo-Mogharbel provided a letter to Plaintiff's attorney,

23  Scott Davis, and opined that Plaintiff could not perform any type of gainful employment.

24  (Tr. 1117.)  The ALJ did "not give great weight to those opinions" because they were not

25

26      [3]  Administrative hearing exhibit 16F is Dr. Dickstein's physical residual capacity
   assessment.  (Tr. 742-49.)

27      [4]  Dr. Acevedo-Mogharbel's October 8, 2010 opinion regarding Plaintiff's
28  functional capacity was completed in relation to Plaintiff's "application for a discharge of
   a federal student loan and/or a teaching serve obligation for a federal grant on the basis
   that he or she has a total and permanent disability."  (Tr. 1121.)

1    supported by the overall record evidence, including Dr. Acevedo-Mogharbel's own

2    treatment notes. (Tr. 35-36.) This finding is free from legal error and is supported by

3    substantial evidence.

4         When Dr. Acevedo-Mogharbel initially examined Plaintiff in November 2008,

5    Plaintiff had a normal gait, full range of motion, normal strength and tone of extremities,

6    and an appropriate mood and affect. (Tr. 523-25.) As the ALJ noted, Dr. Acevedo-

7    Mogharbel's later treatment notes through August 2011, indicate that Plaintiff had a

8    decreased range of motion with tenderness in the cervical spine, intermittent lower

9    extremity edema, and some abdominal tenderness. However, the majority of

10   Dr. Acevedo-Mogharbel's treatment notes indicate that Plaintiff's neurologic, respiratory,

11   cardiovascular, musculoskeletal, and psychiatric findings were normal. (Tr. 36, 513-24,

12   696-99, 1123-49.) For example, in May 2010, she noted that Plaintiff had full range of

13   motion in her spine, a stable gait, full joint range of motion, and "5/5" muscle strength

14   and tone. (Tr. 1142.)

15        Plaintiff argues that in rejecting Dr. Acevedo-Mogharbel's assessments, the ALJ

16   "ignored the nature of fibromyalgia, the methodology for diagnosing fibromyalgia and

17   the manner of assessing is severity." (Tr. 23 at 15.) Plaintiff further argues that based on

18   the manner in which fibromyalgia is diagnosed; the ALJ erred in requiring objective

19   evidence of fibromyalgia. (Doc. 23 at 15.) As Plaintiff states, however, the ALJ found

20   that Plaintiff's fibromyalgia was a severe impairment. (Doc. 23 at 15, Tr. 30.) Contrary

21   to Plaintiff's assertion, the ALJ did not require objective medical evidence of Plaintiff's

22   fibromyalgia and considered it a severe impairment. The ALJ did not err in considering

23   the medical records of Plaintiff's fibromyalgia.

24        **2.      Dr. Ryklin**

25        Plaintiff also asserts that the ALJ erred by not giving "substantial weight" to

26   Dr. Ryklin's September 8, 2011 opinion that Plaintiff "is unable to perform even

27   sedentary work activity, and has severe pain and fatigue."  (Tr. 36.) In assigning less

28   than substantial weight to Dr. Ryklin's assessment, the ALJ noted that Dr. Ryklin's

September 8, 2011 assessment appeared to be based, at least in part, on Plaintiff's hospitalization during the previous month for deep vein thrombosis.  (Tr. 36 (citing Tr. 1120 Dr. Ryklin's notation that plaintiff "was discharged from the hospital 8/11/11 after extensive blood clot treatment that has further limited her function and activity tolerance.").)   The record indicates that, although Plaintiff's deep vein thrombosis "further" limited her ability to function, that impairment was not expected to remain severe for the requisite twelve continuous months.  (Tr. 30-31, 36.)   Accordingly, the ALJ did not err in giving little weight to Dr. Ryklin's assessment to the extent that it was based on Plaintiff's deep vein thrombosis because, although it "further" limited Plaintiff's functional abilities, it was expected to be of limited duration.

The ALJ further noted that Dr. Ryklin's opinion was not supported by his own treatment notes.  (Tr. 36.)  As the ALJ noted, during the initial July 2, 2010 examination, Dr. Ryklin noted that Plaintiff had eleven of eighteen fibromyalgia tender points.  (Tr. 798.)  He also noted that Plaintiff could heel walk, toe walk, perform a full squat, and climb onto the examination table without difficulty.  (*Id.*)  Dr. Ryklin's notes also indicated that Plaintiff had "5/5" strength bilaterally in her lower extremities, no "focal motor weakness," intact sensation to light touch and pinprick, and her reflexes were equal and symmetric at the knees and ankles.  (Tr. 798.)  The record reflects that during 2010 follow-up appointments with Nurse Linda Milam, Plaintiff reported decreased range of motion, muscle spasms, and tenderness or pain, but she also consistently reported that her medications controlled her pain "reasonably well" without side effects and that they helped her maintain her functional status and quality of life.  (Tr. 1019, 1022, 1024, 1027, 1030.)  Although Plaintiff reported experiencing "burning pain," in a final treatment note dated August 1, 2011, she indicated that she had "good relief" from a trigger point injection from the week before.  (Tr. 986-87.)

### 3.     The ALJ's Determination is Supported by Substantial Evidence

The ALJ did not err in giving less than substantial weight to the opinions of Dr. Acevedo-Mogharbel and Dr. Ryklin and that determination is supported by

- 15 -

substantial evidence in the record, which the ALJ discussed in her opinion.   The treatment notes of Michael J. Fairfax, D.O., and Joe K. Gregory, D.O., support the ALJ's determination.  As the ALJ noted, Dr. Fairfax examined Plaintiff in September 2006 and diagnosed fibromyalgia.  (Tr. 35.)  Plaintiff reported that she could carry on normal activities and her physical examination was within normal limits.  (*Id.*)  Dr. Fairfax examined Plaintiff again in November 2006 and, although Plaintiff reported worsening of her condition, the examination remained the same.  (*Id.*, Tr. 337-55.)  Additionally, Joe K. Gregory, D.O., a treating physician, examined Plaintiff in July 2007 and noted that Plaintiff had a normal range of motion without signs of edema or cyanosis.  (Tr. 35, 432-42.)  In August 2007, Dr. Gregory again noted that Plaintiff had no signs of edema or cyanosis.  (Tr. 432-42.)

The treatment notes from the Mesa Pain Management Center from 2009 to 2010 also support the ALJ's determination.  As the ALJ noted, these records indicated that, although Plaintiff had a decreased range of motion in her lumbar spine, her medications provided "adequate" pain relief, she could function "adequately," and that she could perform ADLs and function independently.  (*See* Section II.A.4, *supra*.)  Additionally, Dr. Abrante noted that Plaintiff was fatigued, but otherwise doing well (Tr. 1104, 1100-02), and noted that she had a normal gait and station, and no edema or cyanosis of the extremities.  (Tr. 1100-1102.)

The opinion of non-examining physician Dickstein, which the ALJ gave "persuasive weight," is consistent with the overall record, including the treatment notes of Dr. Fairfax, Dr. Gregory, Dr. Ryklin, Dr. Acevedo-Mogharbel, and the Mesa Pain Management Center.  (Tr. 38.)  The ALJ properly gave Dr. Dickstein's assessment persuasive weight because it is consistent with other evidence in the record.  *See Thomas*, 278 F.3d at 957 (stating that "[t]he opinions of non-treating or non-examining physicians may also serve as substantial evidence when the opinions are consistent with independent clinical findings or other evidence in the record"); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001) (same).

1    In summary, the ALJ did not err in assigning less than substantial weight to the

2    opinions of Dr. Acevedo-Mogharbel and Dr. Ryklin and the ALJ's determination is

3    supported by substantial evidence in the record.  *See Richardson*, 402 U.S. at 401

4    (substantial evidence is "such relevant evidence as a reasonable mind might accept as

5    adequate to support a conclusion.").

6    **C.    Plaintiff's Credibility**

7    **1.    The Two-Step Analysis**

8    Plaintiff also asserts that the ALJ erred in finding her testimony less than credible.

9    An ALJ engages in a two-step analysis to determine whether a claimant's testimony

10   regarding subjective pain or symptoms is credible.  *Lingenfelter v. Astrue*, 504 F.3d 1028,

11   1035-36 (9th Cir. 2007).  "First, the ALJ must determine whether the claimant has

12   presented objective medical evidence of an underlying impairment 'which could

13   reasonably be expected to produce the pain or other symptoms alleged.'"  *Id*. at 1036

14   (quoting *Bunnell v. Sullivan*, 947 F.2d 341, 344 (9th Cir. 1991) (en banc)).

15   The claimant is not required to show objective medical evidence of the pain itself

16   or of a causal relationship between the impairment and the symptom.  *Smolen*, 80 F.3d at

17   1282.  Instead, the claimant must only show that an objectively verifiable impairment

18   "could reasonably be expected" to produce his pain."  *Lingenfelter*, 504 F.3d at 1036

19   (quoting *Smolen*, 80 F.3d at 1282); *see also Carmickle v. Comm'r of Soc. Sec.*, 533 F.3d

20   at 1160–61 (9th Cir. 2008) ("requiring that the medical impairment 'could reasonably be

21   expected to produce' pain or another symptom . . . requires only that the causal

22   relationship be a reasonable inference, not a medically proven phenomenon").

23   Second, if a claimant shows that he suffers from an underlying medical

24   impairment that could reasonably be expected to produce his pain or other symptoms, the

25   ALJ must "evaluate the intensity and persistence of [the] symptoms" to determine how

26   the symptoms, including pain, limit the claimant's ability to work.  *See* 20

27   C.F.R. § 404.1529(c)(1).  In making this evaluation, the ALJ may consider the objective

28   medical evidence, the claimant's daily activities, the location, duration, frequency, and

1    intensity of the claimant's pain or other symptoms, precipitating and aggravating factors,

2    medication taken, and treatments for relief of pain or other symptoms.   *See* 20

3    C.F.R. § 404.1529(c); *Bunnell*, 947 F.2d at 346.

4            At this second evaluative step, the ALJ may reject a claimant's testimony

5    regarding the severity of his symptoms only if the ALJ "makes a finding of malingering

6    based on affirmative evidence," *Lingenfelter*, 504 F.3d at 1036 (quoting *Robbins v. Soc.*

7    *Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006)), or if the ALJ offers "clear and

8    convincing reasons" for finding the claimant not credible.  *Carmickle*, 533 F.3d at 1160

9    (quoting *Lingenfelter*, 504 F.3d at 1036).

10           **2.      ALJ's Assessment of Plaintiff's Credibility**

11           The ALJ found that Plaintiff had the residual functional capacity to perform a

12   limited range of light work.  (Tr. 33-34.)  In making this determination, the ALJ found

13   that Plaintiff's allegations were "not fully credible with regard to the severity and extent

14   of her limitations." (Tr. 38.)  Because there was no finding of malingering, the ALJ was

15   required to give clear and convincing reasons for finding Plaintiff not credible.

16   *Carmickle*, 533 F.3d at 1160.  Plaintiff asserts that the ALJ failed to give clear and

17   convincing reasons for rejecting her testimony.  (Doc. 23 at 14.)

18           Contrary to Plaintiff's assertion, the ALJ did not err in assessing Plaintiff's

19   credibility, and the ALJ supported her findings that Plaintiff's limitations were less

20   serious than alleged with clear and convincing reasons.  *See Nyman v. Heckler*, 779 F.2d

21   528, 531 (9th Cir. 1986) (stating that the reviewing court gives great weight to the ALJ's

22   credibility determination.)

23           The ALJ noted that in March 2011, Plaintiff was attempting to start an online

24   retail business.  (Tr. 38.)  Additionally, as the ALJ noted, client progress notes from

25   Phoenix Interfaith Counseling indicate that Plaintiff was busy "getting her business

26   together, scheduling appointments, and finishing projects."  (Tr. 38, Tr. 936, 937, 942,

27   944-46, 948, 950, 954, 959, 967, 969.)  In January and April 2011, Plaintiff house sat for

28   a friend.  (Tr. 38, Tr. 942, 954.)  A client progress note from March 25, 2011, indicates

- 18 -

that Plaintiff reported "the injections work and that she was not in as much pain" and had "more energy."  (Tr. 38, Tr. 944.)  The ALJ properly considered Plaintiff's activity level, including evidence that she was attempting to work, in assessing her credibility.  *See Bray v. Astrue*, 554 F.3d 1219, 1227 (9th Cir. 2009) (the fact that a claimant has sought out employment weighs against a finding of disability); *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992) (stating that claimant's activity level is relevant to assessing subjective complaints); *Decker v. Chater*., 86 F.3d 953, 955 (10th Cir. 1996) (the fact that claimant regularly exceeded work restrictions imposed by his doctors was relevant to assessing the credibility of his testimony of disabling pain).

As the ALJ noted, the record includes inconsistent statements that discredit Plaintiff's subjective complaints.  First, Plaintiff testified during the administrative hearing that she had the Epstein-Barr virus.  (Tr. 38, 83-84.)  However, as the ALJ noted, the record does not contain such a diagnosis.  Additionally, Plaintiff testified that she has to elevate her legs above heart level for two hours daily, and has to wear compression stockings for two years.  (Tr. 85-86.)  However, this testimony is inconsistent with the recommendations of her treating vascular surgeon.  (Tr. 38, Tr. 1097-99 (recommending that Plaintiff wear compression stockings for two years, but not specifying how long Plaintiff should elevate her leg during the day).)  The ALJ also noted that Plaintiff testified that her mental health had not improved with counseling, (Tr. 38, Tr. 61), but the record evidence indicated that Plaintiff's mental health symptoms had improved. (Tr. 936-82.)

Additionally, the ALJ noted that although Plaintiff testified that she experienced side effects from her medication, including dizziness, nausea, vomiting, and "sleepiness," (Tr. 63), the record evidence reflected that those side effects were not as severe as Plaintiff indicated.  (Tr. 38, 511-40, 635-94, 695-701, 756-71, 793-805, 936-85, 986-1047, 1122-57.)[5]  In August, September, October, November, and December 2010,

---

[5]  For example, several treatment notes from Dr. Acevedo-Mogharbel do not indicate that Plaintiff was experiencing any side effects, but that she should "call if any problems with medications and side effects."  (Tr. 1123, 1126, 1128, 1132, 1140, 1143.)

1    Plaintiff denied experiencing any side effects from her medication, "such as constipation,

2    nausea, vomiting, or excessive sedation."  (Tr. 1019, 1022, 1024, 1027, 1030.)

3           As part of the overall disability analysis, the ALJ must consider whether there are

4    any inconsistencies in the evidence, such as Plaintiff's inconsistent statements.  *See* 20

5    C.F.R. § 404.1529(c)(4) (stating that an ALJ must consider "whether there are any

6    inconsistencies in the evidence."); Social Security Ruling 96-7p, 1996 WL 374186, at *5

7    (stating that a strong indicator of the credibility an individual's statements is their

8    consistency, both internally and with other information in the record); *Webb v. Barnhart*,

9    433 F.3d 683, 688 (9th Cir. 2005) ("Credibility determinations do bear on evaluations of

10   medical evidence when an ALJ is presented with conflicting medical opinions or an

11   inconsistency between a claimant's subjective complaints and his diagnosed condition.").

12   Thus, the ALJ properly considered Plaintiff's inconsistent statements and inconsistencies

13   between her statements and the medical record when assessing her credibility.  The ALJ

14   provided clear and convincing reasons for discrediting Plaintiff's testimony.

15   **VII.    Conclusion**

16          The ALJ did not commit legal error in discounting Plaintiff's testimony regarding

17   the severity of her symptoms or in giving little weight to the assessments of Dr. Acevedo-

18   Mogharbel and Dr. Ryklin, and the record contains substantial evidence in support of the

19   ALJ's determination that Plaintiff was not disabled.

20          Accordingly,

21          **IT IS ORDERED** that the Commissioner's decision denying Plaintiff benefits

22   in this case is **AFFIRMED**.  The Clerk of Court is directed to terminate this action.

23   / / /

24   / / /

25   / / /

26   / / /

27   / / /

28   / / /

1    **IT IS FURTHER ORDERED** that the parties' Joint Inquiry Regarding Status

2    (Doc. 29) is **DENIED** as moot.

3                    Dated this 6th day of November, 2013.

4

5

6    _____

7                                    Bridget S. Bade
                            United States Magistrate Judge
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28